Deborah MOODY–HERRERA,
Appellant and

Cross–Appellee,

v.

STATE of Alaska, DEPARTMENT OF
NATURAL RESOURCES, Appellee
and Cross–Appellant.

Nos. S–8221, S–8191, 5050.

Supreme Court of Alaska.

Nov. 27, 1998.

Bradley D. Owens, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant/Cross–Appellee.

Sarah J. Felix, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

We consider here whether a hearing-impaired employee's assertion that her employer failed to reasonably accommodate her disability states a viable disability discrimination claim under AS 18.80.020. We hold that it does. But we affirm the judgment against the employee because we also hold that the trial court did not err in concluding that she failed to establish a prima facie claim of disability discrimination. We also affirm the award of attorney's fees against the employee and reject the employ-er's claim that it should have been awarded enhanced attorney's fees.

### II. FACTS AND PROCEEDINGS

In 1981 the State of Alaska, Department of Natural Resources (DNR) hired Deborah Moody–Herrera (Moody) as a Photocopy Machine Operator I upon the referral of the State of Alaska, Division of Vocational Rehabilitation (DVR). Moody was promoted to Micrographics Equipment Operator I (MEO I) in 1982. The DNR section in which she worked produced and maintained all the maps of the state's land holdings. Moody's job involved photographing large plats showing ownership interests in state land.

In May 1989 DNR installed new equipment in Moody's workplace. Moody was required to learn to operate more computerized equipment than she had previously operated. She received about one week of training on the equipment, which was more training than the others in her section received. Soon after the new equipment arrived, DNR reclassified Moody as an MEO II, a position requiring her to perform at a higher level and work independently.

Bud Mayes supervised Moody until January 16, 1990. While he supervised her, Moody's evaluations were acceptable or better. Wendy Woolf supervised Moody for a month during Mayes's absence, and from January 16, 1990, to December 1990. Woolf immediately noted problems in Moody's job performance. These problems included tardiness; production backlog; excessive sick leave usage; failure to prioritize work tasks; failure to work independently; inability to use "PROFS," a computer program necessary to the job; and failure to keep up with her PROFS software account. Woolf also noted that Moody fell behind in work, wasted time, refused to seek computer support in the manner directed by her supervisor, left her work station with the phone off the hook so it would not be discovered that she was gone, and made numerous personal phone calls during work.

Marilyn Morris supervised Moody from December 1990 until Moody's termination. Morris noted that Moody refused to follow

instructions on delivering items by mail rather than in person; refused to follow instructions on how to seek computer support; lost control and yelled at Morris; failed to follow written instructions on the use of the computer program; failed to follow written instructions on another occasion, thereby causing the destruction of historical records; and was absent during work hours. Morris progressively disciplined Moody by writing a letter of reprimand, a letter of warning, and a letter of suspension.

During periods when Moody was absent or unable to work in micrographics, another employee, Eleanor Magowan, successfully performed Moody's job in half the time.

Both parties agree and the superior court found that Moody has a substantial hearing disability. The superior court also found that Moody's hearing may have deteriorated during her DNR employment. Moody requested several accommodations during her employment. In August 1990 Moody requested written instructions which DNR apparently provided. When asked in October and November 1991 what further accommodations she needed, Moody stated that she just needed a professional work environment in which she could perform her job duties. In October 1991 DNR asked Moody to provide evaluations from her physicians indicating whether she was able to return to work and what, if any, accommodations were needed. Three physicians completed the evaluations, stating that Moody was able to return to work. Only one doctor recommended an accommodation—ear protection—which DNR apparently provided. On February 27, 1992, Moody requested that she be allowed to tape record a meeting with Morris. DNR Human Resources Manager Ellen Clothier (then Hazeltine) told Morris that taping was not appropriate. Although taping was not allowed, Moody apparently recorded part of the meeting. On March 30, 1992, Moody requested an interpreter. Morris consulted with Clothier, who contacted Moody's DVR counselor, Duane Mayes. DNR did not provide an interpreter, apparently because Mayes said that an interpreter would not be appropriate because Moody did not know American Sign Language.

During Moody's employment, DNR provided Moody with the following accommodations, special telephone accommodations, a fisheye mirror so she could see people entering her work area, an amplified fire alarm, other staff to assist Moody in evacuating the building during emergencies, ear protection, numerous written instructions on work procedures, special equipment training, and written expectations of job performance. DNR also: asked DVR counselor Mayes about the need for further accommodations, worked with Moody's union representatives, allowed family members to attend meetings about Moody's job performance, allowed nearly unlimited leave in 1991, asked Moody what additional accommodations she needed, offered her a job with simpler duties and responsibilities for the same pay and benefits in January 1992, provided additional training, and provided written reports on her progress.

Moody was fired on April 29, 1992. Moody then filed suit against DNR under the Alaska Human Rights Act, alleging that DNR discriminated against her on the basis of sex, parenthood, and physical disability. The superior court tried the case without a jury. Moody presented evidence only on the issue of disability discrimination. The superior court held that Moody had abandoned her other claims. Moody argued that DNR violated AS 18.80.220(a)(1) by "fail[ing] to adequately consider or make reasonable accommodations of her disabilities and, as a result, her employment with DNR was unlawfully terminated in April 1992."

The superior court disagreed and found that Moody's "work problems were not a product of DNR's alleged failure to reasonably accommodate [Moody], but were instead the product of her own attitude and personal problems and unhappiness." The court stated that it was

left with the distinct impression that the personality differences between [Moody] and her supervisors led [Moody] to rely on her disability as a manipulative lever in her relationship with them. For all the focus on disability in the discussion of this case, however, the court finds this really to be a case of an employee who failed in her

performance not due to her disability but due to other factors in her life and personality.

The court entered judgment against Moody and awarded the State attorney's fees against her.

Moody appeals that decision and the award of attorney's fees against her. The State cross-appeals the denial of its request for enhanced attorney's fees.

## III.  DISCUSSION

### A.  Standard of Review

Whether AS 18.80.220 provides for a claim against an employer for failure to provide reasonable accommodation is a question of statutory interpretation to which we apply our independent judgment.[1] We will adopt the principles of law which are most persuasive in light of precedent, reason, and policy.[2]

Whether Moody established her prima facie case is a mixed question of law and fact.[3] We review the court's factual findings under the clearly erroneous standard.[4] Questions of law, such as the determination of the elements of the prima facie case, are reviewed de novo.[5]

We review the award or denial of attorney's fees for abuse of discretion.[6] Whether we should adopt the federal exception for attorney's fees assessments against losing civil rights plaintiffs is a question of law to which we apply our independent judgment. We will adopt the principles of law which are most persuasive in light of precedent, reason, and policy.[7]

### B.  Is an Employer's Failure to Provide Reasonable Accommodation to a Disabled Employee Actionable under the Alaska Human Rights Act?

Alaska Statute 18.80.220 prohibits discrimination against disabled employees.[8] The Alaska Human Rights Act (AHRA), which includes AS 18.80.220, does not explicitly state that employers have a duty to provide reasonable accommodation to disabled employees. But the AHRA does not define the term "discriminate." Does a failure to provide reasonable accommodation to a disabled employee amount to "discriminat[ion] against a person in compensation or in a term, condition, or privilege of employment"?

Moody argues that employers owe a duty under the AHRA, just as they do under federal law, to reasonably accommodate disabled employees. She claims that a disability discrimination claim differs from a dissimilar treatment claim and that "[t]he failure to treat individuals with disabilities *differently* from similarly situated employees without disabilities is a violation of the duty to make reasonable accommodation." Moody implicitly claims that she therefore has a claim under the AHRA because her employer did not reasonably accommodate her disability.

1.  See University of Alaska v. Tumeo, 933 P.2d 1147, 1150 n. 6 (Alaska 1997).

2.  See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

3.  See Gafford v. General Elec. Co., 997 F.2d 150, 169 n. 10 (6th Cir.1993) ("[T]he determination that a plaintiff has or has not established a prima facie case of disparate treatment encompasses both questions of law (viz., determination of the elements of a prima facie case), and questions of fact (viz., whether the plaintiff has proven to the factfinder each element of the prima facie case by a preponderance of the evidence).").

4.  See Alaska USA Fed. Credit Union v. Fridriksson, 642 P.2d 804, 806–07 (Alaska 1982).

5.  See Gafford, 997 F.2d at 169 n. 10.

6.  See McNett v. Alyeska Pipeline Serv. Co., 856 P.2d 1165, 1167 (Alaska 1993).

7.  See Guin, 591 P.2d at 1284 n. 6.

8.  AS 18.80.220 prohibits discrimination in employment because of "physical ... disability" not relevant to the reasonable demands of the position:

(a) ... [I]t is unlawful for (1) an employer to refuse employment to a person, or to bar a person from employment, or *to discriminate against a person in compensation or in a term, condition, or privilege of employment because of* the person's race, religion, color or national origin, or because of the person's age, *physical or mental disability*, sex, marital status, changes in marital status, pregnancy, or parenthood *when the reasonable demands of the position do not require distinction* on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy or parenthood.

(Emphasis added.)

Before determining whether DNR reasonably accommodated Moody's disability, we must first decide the threshold question implicated by Moody's claim—whether the AHRA requires employers to reasonably accommodate disabled employees.

In interpreting the AHRA, we have previously looked for guidance in the parallel body of federal employment discrimination law of Title VII, 42 U.S.C. § 2000e et seq. (1994 & supp. II 1996), and the accompanying federal cases.[9] In following federal cases that interpret Title VII, we have recognized two main theories on which to base a claim of employment discrimination under the AHRA: disparate treatment and disparate impact.[10] Title VII, however, does not address employment discrimination on the basis of physical or mental disability and therefore does not require employers to accommodate employees' disabilities.[11]

Moody suggests that we follow the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (1994 & supp. II 1996), and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (1994 & supp. II 1996), in imposing a duty of reasonable accommodation. The Rehabilitation Act prohibits the federal government and employers who receive federal funds from discriminating against employees with disabilities.[12] The ADA was enacted in 1990 and extended the prohibition against disability discrimination to all employers with fifteen or more employees.[13] The ADA provides in relevant part that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. [[14]]

The ADA then states that the term "discriminate" includes:

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such a covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. [[15]]

---

**9.** *See, e.g., Thomas v. Anchorage Tel. Util.,* 741 P.2d 618, 622 (Alaska 1987); *Alaska State Comm'n for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980).

**10.** *See Thomas,* 741 P.2d at 622, 628.

**11.** *See* 42 U.S.C. § 2000e et seq. (1994 & supp. II 1996). But Title VII prohibits discrimination on the basis of religion and requires employers to reasonably accommodate the religious beliefs of employees. *See* 42 U.S.C. § 2000e(j) (1994); *see also Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 71–76 & n. 11, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (holding that requirement of reasonable accommodation of religious beliefs was defensible construction of Title VII before Congress amended statute to explicitly so require). We have also found a similar implied duty under the AHRA. *See Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860, 864 (Alaska 1978).

**12.** 29 U.S.C. § 794(a) (1994). Subsection 504(a) of the Rehabilitation Act provides that

[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a) (1994); *see also Stone v. City of Mt. Vernon,* 118 F.3d 92, 96 (2d Cir.1997). Regulations under this statute require recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped ... employee unless the recipient can demonstrate that the accommodation would impose an undue hardship in the operation of its program." 45 C.F.R. § 84.12(a) (1997).

**13.** 42 U.S.C. §§ 12111(5), 12112 (1994).

**14.** 42 U.S.C. § 12112(a) (1994).

**15.** 42 U.S.C. § 12112(b)(5)(A) (1994). As defined in the ADA, the term "discriminate" also includes the following:

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter ...;
(3) utilizing standards, criteria, or methods of administration—

"In construing the meaning of a statute, we look to the meaning of the language, the legislative history, and the purpose of the statute in question." [16] " 'The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others.' " [17]

■ We apply a sliding scale approach in matters of statutory interpretation, and have rejected a mechanical application of the plain meaning rule.[18] "The plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." [19]

### 1. *Language*

It is not clear from the plain language of AS 18.80.220 whether the term "discriminate" includes a failure to reasonably accommodate employees' disabilities. *Webster's New World Dictionary* defines "discriminate" as "to constitute a difference between; differentiate," and "to make distinctions in treatment; show partiality (in favor of) or prejudice (against)." [20] *Black's Law Dictionary* defines "discrimination" as

> (A) that have the effect of discrimination on the basis of disability; or
> (B) that perpetuate the discrimination of others who are subject to common administrative control;
> (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;
> . . . .
> (5)(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;
> (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless . . . [it] is shown to be job-related for the position in question and is consistent with business necessity; and
> (7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such a test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other

[i]n constitutional law, the effect of a statute or established practice which confers particular privileges on a class arbitrarily selected from a large number of persons, all of whom stand in the same relation to the privileges granted and between whom and those not favored no reasonable distinction can be found. [ [21]]

Usually "discrimination" has meant "to set aside" and "to make distinctions" between similarly situated people. Perhaps, though, an employer's failure to make distinctions that are necessary for an employee to do his or her job sets that employee apart from other employees in an unfair way.

Moody argues that disability discrimination is "markedly different" than other types of discrimination prohibited by Title VII, on the theory that a disabled person seeking reasonable accommodation may want an employer to treat her differently than other employees. But this is not the only way employers might discriminate against disabled employees. An employer might discriminate against disabled employees by paying them less than other employees, giving them unmanageable workloads, or dismissing them because of their disabilities.[22] Each of

> factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such an employee or applicant (except where such skills are the factors that the test purports to measure).
> 42 U.S.C. § 12112(b) (1994).

16. *Muller v. BP Exploration (Alaska) Inc.*, 923 P.2d 783, 787 (Alaska 1996).

17. *Id.* (quoting *Tesoro Alaska Petroleum Co. v. State,* 746 P.2d 896, 905 (Alaska 1987)).

18. *See State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982) (citing *State, Dep't of Natural Resources v. City of Haines*, 627 P.2d 1047, 1049 n. 6 (Alaska 1981)).

19. *Muller*, 923 P.2d at 788 (citing *Anchorage Sch. Dist. v. Hale*, 857 P.2d 1186, 1189 (Alaska 1993)); *see also Alex*, 646 P.2d at 208–09 n. 4.

20. *Webster's New World Dictionary* 403 (2d ed.1972).

21. *Black's Law Dictionary* 467 (6th ed.1990).

22. *See, e.g., Alaska State Comm'n for Human Rights ex rel. Zuniga v. Inlet Towers Suites Hotel,*

these actions would fit under the traditional definition of "discrimination" as different treatment. Moody's proposed definition, therefore, is not necessary for a meaningful reading of the statute.

Therefore, we conclude that the statute's language does not clearly give an employee a claim for an employer's failure to reasonably accommodate the employee's disability.

### 2. *Legislative history*

In 1969 the legislature prohibited discrimination on the basis of "physical handicap." [23] It appears that the House added "physical handicap" to the Senate Bill just before the last vote, without any memorialized discussion.[24] In 1987 the legislature significantly amended AS 18.80, and added language prohibiting discrimination on the basis of "physical or mental disability" in sections .210, .220, .230, .240, .250, and .255.[25] It also stated in section .200 that it was the policy of Alaska to "encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment." [26]

Although no legislative history explicitly shows that the legislature, in enacting or amending AS 18.80.220, intended to impose a duty of reasonable accommodation on employers, several clues suggest that this is what the legislature intended. First, the same 1987 bill that amended AS 18.80.220 also amended AS 18.80.050 to require the Alaska Human Rights Commission to adopt regulations concerning when reasonable accommodation is necessary to employ a disabled person.[27] Although the Commission apparently has not yet promulgated such regulations, this requirement implies that the legislature intended that employers have a duty of reasonable accommodation.

Second, the 1987 bill contained a passage that, if enacted, would have potentially eliminated a duty of reasonable accommodation for physically disabled persons.[28] The bill as passed did not contain that section. A letter in committee files may explain why. The Commission opposed proposed section .256, which it felt would "eliminate[ ] the commission's exercise of its present authority on behalf of the physically handicapped in employment." [29] The Commission's letter stated:

> The commission presently requires employers to make reasonable accommodation to enable the physically handicapped to be gainfully employed. In imposing this requirement, the commission considers evidence presented by the employer that accommodation is prevented by business necessity—including the prohibitive costs of the proposed accommodation. Section AS 18.80.256 would eliminate the present re-

No. C–95–199 (ASCHR Jul. 7, 1997) (involving claims of hostile work environment, termination due to disability, and retaliation for opposing discriminatory practices).

23. AS 18.80.220, *as amended by* ch. 119, § 4, SLA 1969.

24. 1969 House Journal 925.

25. AS 18.80, *as amended by* ch. 69, § 7, SLA 1987.

26. AS 18.80.200(b). The subsection states:

> Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, ... because of ... physical or mental disability.... It is also the policy of the state to encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment.

27. AS 18.80.050(b) provides in part: "The commission shall adopt regulations relating to discrimination because of physical and mental disability. The regulations must furnish guidance concerning the circumstances under which it is necessary to make a *reasonable accommodation* for a physically or mentally disabled person when providing *employment ....*" (Emphasis added.)

28. Section 18.80.256 would have provided: "This chapter may not be construed to require, or affect other laws that require or provide for, the alteration or remodeling of buildings, facilities, or vehicles in order to provide access to or accommodate the needs of a person with a physical disability." Work draft of Senate Bill 1 (available in Senate HESS Committee Files on C.S.S.B. 1).

29. Letter from Janet L. Bradley, Human Rights Commission, to Senator Paul Fischer (Feb. 2, 1987) (available in Senate HESS Committee Files on C.S.S.B. 1).

quirement for many Alaskan employers to make reasonable accommodation to employ the disabled.[ [30] ]

The legislature did not enact section .256.[31] In conjunction with its adoption of subsection .050(b), the legislature's failure to adopt section .256 suggests that it intended that the Commission continue to have authority to require employers to provide reasonable accommodation.

### 3. *Purpose*

The AHRA's purpose also supports finding an implied duty for an employer to make reasonable accommodation for a disabled employee. In stating the purpose of AS 18.80, the legislature found

> that discrimination against an inhabitant of the state because of ... physical or mental disability ... is a matter of public concern and that this discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants.[ [32] ]

The legislature therefore enacted AS 18.80 "to eliminate and prevent discrimination," and "to encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment." [33]

We have consistently held that the AHRA "should be broadly construed to further the goal of eradication of discrimination." [34]

Interpreting the term "discriminate" in AS 18.80.220 to include the failure to reasonably accommodate disabled employees furthers the goal of eradicating discrimination and enables disabled persons to participate fully

in the economic life of the state and to engage in remunerative employment. Unless there is a duty to accommodate disabled employees, the statute's purpose cannot be fully realized.

### 4. *Agency interpretation*

■ Several decisions of the Alaska Human Rights Commission support a conclusion that the failure to reasonably accommodate an employee is "discrimination" under AS 18.80.220. Although no recent decisions address the issue of reasonable accommodation, two older opinions considered whether reasonable accommodation was required or performed by an employer, suggesting that the Commission interpreted AS 18.80.220 to require reasonable accommodation.[35]

In *Bell v. Parker Drilling Co.*, No. A–75–1021–531E (ASCHR Apr. 23, 1977), the Commission dismissed Bell's complaint, finding that he was unable to perform the reasonable demands of the job and that there were no reasonable accommodations that the employer could perform. The Commission stated,

> The "principal [sic] of reasonable accommodation" advanced by the Complainant is as yet undeveloped in Alaska law. It does, however, have a long history in Federal fair employment law and is an element of the "business necessity" defense....
>
> If the employer successfully demonstrates that there is [sic] no alternative policies or practices which would accomplish the business purpose equally well with a lesser differential impact vis-a-vis physical handicap, then the employer has essentially demonstrated that no reasonable accommodation is possible. In the instant case, Respondent is not

---

**30.** *Id.*

**31.** *See* AS 18.80, *as amended by* ch. 69, SLA 1987.

**32.** AS 18.80.200(a).

**33.** AS 18.80.200(b).

**34.** *University of Alaska v. Tumeo*, 933 P.2d 1147, 1152 (Alaska 1997); *Thomas v. Anchorage Tel. Util.*, 741 P.2d 618, 629 (Alaska 1987); *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978) ("In

view of the strong statement of purpose in enacting AS 18.80, and its avowed determination to protect civil rights of all Alaska citizens, we believe that the legislature intended to put as many 'teeth' into this law as possible.") (citation omitted).

**35.** "While this court exercises independent judgment on issues of statutory construction, the [agency's] interpretation is entitled to 'some weight.'" *Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991) (quoting *State, Dep't of Revenue v. Alaska Pulp America, Inc.*, 674 P.2d 268, 274 (Alaska 1983)).

required to accommodate the handicap of the Complainant. No such accommodation of a person with such a hearing disability and speech impairment for a position on a drilling rig is possible, short of hiring him as a wholly superfluous employee.[ [36]]

In *Kirkpatrick v. Ketchikan Pulp Co.,* No. K–74–1025–073–E–E at 5 (ASCHR Feb. 3, 1978), the Commission held that an employer who denied a job applicant a position because of a skin condition "did attempt a reasonable accommodation of the complainant's medical problem" by suggesting that she apply for another position in the company.[37] *Bell* and *Kirkpatrick* illustrate that the Commission interprets AS 18.80.220 to require reasonable accommodation of a disability by an employer.

### 5. *Other states' decisions*

Many states have enacted statutes that mirror the ADA and explicitly require employers to reasonably accommodate disabled employees.[38]

Other states whose statutes do not require reasonable accommodation have relied on state regulations requiring reasonable accommodation to find that duty.[39] And other states with statutes similar to AS 18.80.220 that do not expressly impose a duty to reasonably accommodate disabled employees have found an implied statutory duty requiring employers to reasonably accommodate disabled employees.[40]

### 6. *Conclusion*

Given the policy underlying AS 18.80, the legislative intent, and the implicit agency interpretation, we conclude that AS 18.80.220 imposes a duty on an employer to reasonably accommodate a disabled employee.

### C. *Did Moody Establish a Prima Facie Case of Disability Discrimination?*

We next address whether Moody made out a prima facie case of a failure by DNR to reasonably accommodate her disability. The superior court held that she did not. Moody argues that the superior court's decision should be reversed because the superior court inappropriately applied the analysis from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to her disability discrimination case.[41]

---

**36.** *Bell v. Parker Drilling Co.,* No. A–75–1021–531E at 6–7 (ASCHR Apr. 23, 1977).

**37.** *Kirkpatrick v. Ketchikan Pulp Co.,* No. K–74–1025–073–E–E at 5 (ASCHR Feb. 3, 1978).

**38.** *See, e.g.,* Ariz.Rev.Stat. Ann. § 41–1463(B)(3) (West 1992); Colo.Rev.Stat. Ann. § 24–34–402(1)(a) (West 1990); Del.Code Ann. tit. 19, §§ 721, 723, 724 (Michie 1995); Kan. Stat. Ann. § 44–1009(8) (1993); La.Rev.Stat. Ann. § 23:323 (West Supp.1998); Me.Rev.Stat. Ann. tit. 5, § 4553(2)(E) (West Supp.1997); Mass. Gen. Laws Ann. ch. 151B, § 4(16) (West 1996); Minn.Stat. Ann. § 363.03, subd. 1(6) (West Supp.1998); Neb.Rev.Stat. §§ 48–1101, 48–1107.02 (1993); N.M. Stat. Ann. § 28–1–7(J) (Michie 1996); N.Y. Exec. Law § 296(3) (McKinney 1998); N.D. Cent.Code § 14–02.4–03 (1997); R.I. Gen. Laws § 28–5–7(1)(iv) (1995); S.C.Code Ann. § 1–13–80(D)(2) (Law Co-op. Supp.1997); Tex. Lab.Code Ann. § 21.128 (West 1996); Va. Code Ann. § 51.5–41 (Michie 1994); Wis. Stat. Ann. § 111.34 (West 1997).

**39.** *See Stansbury v. Blue Cross of Idaho Health Serv., Inc.,* 128 Idaho 682, 918 P.2d 266, 269 (Idaho 1996); *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994); *Maryland Comm'n on Human Relations v. Mayor of Baltimore,* 86 Md.App. 167, 586 A.2d 37, 40 (Md. Spec.App.1991); *City of Clayton v. Missouri Comm'n on Human Rights,* 821 S.W.2d 521, 529

(Mo.App.1991); *Wooten v. City of Columbus,* 91 Ohio App.3d 326, 632 N.E.2d 605, 610–611 (Ohio App.1993); *Braun v. American Int'l Health & Rehab. Serv., Inc.,* 315 Or. 460, 846 P.2d 1151, 1157 (Or.1993); *Coffman v. West Virginia Bd. of Regents,* 182 W.Va. 73, 386 S.E.2d 1, 8–9 (W.Va. 1988), *overruled on other grounds, Skaggs v. Elk Run Coal Co.,* 198 W.Va. 51, 479 S.E.2d 561, 572 (W.Va.1996).

**40.** *See Brand v. Florida Power Corp.,* 633 So.2d 504, 511 n. 12 (Fla.Dist.App.1994); *Holland v. Boeing Co.,* 90 Wash.2d 384, 583 P.2d 621, 622–24 (Wash.1978).

**41.** We have followed federal courts in applying the analysis from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to disparate treatment claims under AS 18.80.220:

First the employee "carr[ies] the initial burden under the statute of establishing a prima facie case of racial discrimination." The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" why the employee was discharged. Finally, the burden shifts back to the employee "to show that [the employer's] stated reason [for discharge] was in fact pretext."

*Haroldsen v. OMNI Enterprises, Inc.,* 901 P.2d 426, 430 (Alaska 1995) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

She argues that the superior court should have applied the analysis used by federal appellate courts in considering a reasonable accommodation claim under the ADA or Rehabilitation Act. DNR argues that the judgment should be affirmed because "the trial court analyzed Moody's claim under AS 18.80 by applying *both* the *McDonnell Douglas* analysis suggested by the state, *and* the statutory analysis that Moody advocated."

Unlike the *McDonnell Douglas* analysis that employs a burden-shifting framework to focus on the reason for the employee's discharge, the reasonable accommodation analysis used by the federal courts focuses on whether reasonable accommodation was available, was provided, or would impose undue hardship on the employer.[42]

It is not necessary to decide which analysis applies. Because both frameworks require the same prima facie showing, and because the superior court concluded that Moody failed to establish a prima facie case of disability discrimination, she loses under either framework.

■ For a disability claim under the ADA or the Rehabilitation Act,[43] a plaintiff establishes a prima facie case by showing (1) that he or she is an individual who has a disability within the meaning of the statute; (2) that he or she could perform the essential functions of the position he or she holds (with or without reasonable accommodation); and (3) that he or she has suffered an otherwise adverse employment decision because of the disability.[44] This showing by the plaintiff is required whether the courts are applying the *McDonnell Douglas* burden-shifting framework or a framework specifically for reasonable accommodation claims.[45]

■ In analyzing Moody's prima facie case, the superior court found that she failed to meet her burden of proving that she was qualified for the MEO II position:

c. The court concludes that [Moody] was unable to do the MEO II job with the reasonable accommodations.

. . . .

e. The court concludes that plaintiff was not qualified for the MEO II job with reasonable accommodations.

The superior court therefore found that Moody did not establish her prima facie case. Moody does not challenge this fact finding. This finding was sufficient to preclude Moody from proving her case under either analysis.

The superior court also found that even if Moody had established her prima facie case, DNR had reasonably accommodated Moody. We note that DNR made extraordinary efforts to accommodate Moody.

Because we conclude that the superior court did not err in requiring Moody to

---

42. *See Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178, 1183 (6th Cir.1996).

43. The plaintiff is required to establish the same prima facie case under both statutes. *See Woodman v. Runyon*, 132 F.3d 1330, 1338 (10th Cir. 1997); *Stone v. City of Mount Vernon*, 118 F.3d 92, 96 (2d Cir.1997).

44. *See Smith v. Midland Brake, Inc.*, 138 F.3d 1304, 1307–08 (10th Cir.1998); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir.1998); *Gaul v. Lucent Tech. Inc.*, 134 F.3d 576, 580 (3d Cir.1998); *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir.1998); *Stone*, 118 F.3d at 96; *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995).

Several federal appellate courts state this last requirement differently; it seems, however, that all basically require the same showing of causation—that there was an adverse employment decision, which would include the failure to make a reasonable accommodation. *See, e.g., Stone*, 118 F.3d at 96 (requiring a showing that the employer refused to make such accommodations); *Terrell*, 132 F.3d at 624 (requiring a showing that plaintiff was discriminated against because of her disability).

At least two federal appellate courts require that the employer have notice of the employee's disability. *See Stone*, 118 F.3d at 96; *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1284 (7th Cir.1996).

45. *Compare Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196–97 (4th Cir.1997) (requiring the above prima facie showing when applying the *McDonnell Douglas* burden-shifting analysis); *Price v. S–B Power Tool*, 75 F.3d 362, 365 (8th Cir.1996) (same); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994) (same); *with Smith*, 138 F.3d at 1307 (requiring the above prima facie showing when applying reasonable accommodation claim analysis); *Cassidy*, 138 F.3d at 633 (same); *Gaul*, 134 F.3d at 580 (same); *Terrell*, 132 F.3d at 624 (same); *Stone*, 118 F.3d at 96 (same); *Benson*, 62 F.3d at 1112 (same).

establish a prima facie case of discrimination and in analyzing Moody's reasonable accommodation claim, we affirm.

D. *There Is No Exception to Civil Rule 82 Attorney's Fees for a Defendant in a Civil Rights Action.*

Moody argues that this court should adopt an exception to awards of fees and costs under Civil Rules 82 and 79 for prevailing defendants in state law civil rights cases similar to the federal rule for Title VII cases.[46] She asserts that a losing plaintiff in a discrimination lawsuit brought under AS 18.80.220(a) should be shielded from liability for fees and costs unless the plaintiff's lawsuit is "frivolous, unreasonable, or without foundation." DNR argues that there is no need to adopt the federal rule because Alaska has a long-standing and well-developed body of law on attorney's fees and costs.

With rare exceptions, litigants in federal courts and the courts of our sister states bear their own attorney's fees absent legislation providing otherwise.[47] Section 706(k) of Title VII so provides: "In any action or proceeding under this title the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee. . . ."[48] But the United States Supreme Court has held in *Christiansburg Garment Co. v. Equal Opportunity Employment Commission* that district courts may only "award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."[49] In so holding, the Court concluded that there were two equitable consid-

erations present in awarding fees to a prevailing plaintiff that were not present in awarding fees to a prevailing defendant.[50] First, "the plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'"[51] Second, awards to prevailing plaintiffs are awards against violators of federal law.[52]

The Court then looked to the legislative history of § 706 and determined that "while Congress wanted to clear the way for suits to be brought under the Act, it also wanted to protect defendants from burdensome litigation having no legal or factual basis."[53] The Court then determined that awarding fees to a defendant only upon a finding that the plaintiff's action was "frivolous, unreasonable, or without foundation" would accomplish both of these goals.[54]

Alaska follows a fundamentally different principle. The system of awarding attorney's fees in Alaska is not based upon similar considerations, and we decline to adopt an exception similar to the federal rule. Prevailing parties in Alaska are normally entitled to recover part of their attorney's fees.[55] The purpose of Rule 82 "is to partially compensate a prevailing party for the . . . fees incurred where such compensation is justified and not to penalize a party for litigating a good faith claim."[56] The limitations added by the United States Supreme Court in *Christiansburg* to awards of attorney's fees in Title VII cases are therefore irrelevant to determinations of attorney's fees in Alaska.

**46.** Although this issue was raised in *Thomas v. Anchorage Telephone Utility*, our resolution of that case rendered the issue moot and we declined to "address or indicate whether we would adopt the federal rule on attorney's fees." *Thomas*, 741 P.2d at 631 n. 18.

**47.** See *Christiansburg Garment Co. v. Equal Opportunity Empl. Comm'n*, 434 U.S. 412, 415, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

**48.** 42 U.S.C. § 2000e–5(k) (1994).

**49.** 434 U.S. at 421, 98 S.Ct. 694.

**50.** *See id.* at 418, 98 S.Ct. 694.

**51.** *Id.* (quoting *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)).

**52.** *See id.*

**53.** *Id.* at 420, 98 S.Ct. 694.

**54.** *Id.* at 421, 98 S.Ct. 694.

**55.** See *Municipality of Anchorage v. Gallion*, 944 P.2d 436, 448 (Alaska 1997); *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 263 (Alaska 1996); Alaska R. Civ. P. 82.

**56.** *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 588 (Alaska 1973).

Moody argues that the broad policies and purposes of AS 18.80.220—"to protect the civil rights of all Alaska citizens and to further the goal of eradicating discrimination"—support the adoption of an exception to the fee-shifting policy followed in Alaska. Moody states that assessing attorney's fees against a losing plaintiff "would likely have a harsh and chilling effect on other individual plaintiffs of modest means who seek to vindicate their civil rights through legal action which they legitimately and zealously pursue." Although we have recognized the legislature's strong statement of purpose in enacting AS 18.80,[57] there is no indication that the legislature intended to further that purpose by excepting unsuccessful plaintiffs from awards of attorney's fees. We also note that the creation of such an exception might encourage plaintiffs to couch their actions in terms of civil rights claims to avoid potential liability under Rule 82 should they lose.

Moody relies on *Crisp v. Kenai Borough School District*, 587 P.2d 1168, 1169 (Alaska 1978), to support her argument that it would be manifestly unreasonable in this case to award attorney's fees against a losing plaintiff who exercised her statutory rights to challenge adverse action taken by her employer. We held in *Crisp* that attorney's fees could not be assessed against a tenured public school teacher who unsuccessfully challenged his dismissal because the teacher had a "statutorily guaranteed right to contest his dismissal in the courts."[58] We partially overruled *Crisp* in *Rosen v. State Board of Public Accountancy*, 689 P.2d 478, 482 (Alaska 1984), to the extent that "*Crisp* purports to establish a rule of law applicable to all cases where there exists the right or opportunity for a de novo review of an administrative proceeding, or where an important right is being asserted...."[59] *Crisp* no longer supports Moody's argument that the nature of her right renders the assessment of attorney's fees unreasonable.

Because we decline to create another exception to Rule 82, we affirm the award of attorney's fees against Moody.

E. *The Trial Court Did Not Err in Failing to Award the State Enhanced Attorney's Fees under Civil Rule 82(b)(3).*

On cross-appeal, DNR argues that the superior court erred by not awarding enhanced attorney's fees under Civil Rule 82(b)(3). DNR argues that seven of the factors in Rule 82(b)(3) support an award greater than thirty percent.

As the prevailing party, DNR was entitled to an attorney's fees award under Rule 82. The award is presumptively thirty percent of the actual attorney's fees necessarily incurred when a case goes to trial but no money judgment is awarded.[60] A trial court may deviate from the schedule if it determines that a variation is warranted upon consideration of the enumerated factors.[61]

"Attorney's fees awards made pursuant to the schedule of Rule 82 are presumptively correct."[62] DNR has not demonstrated that the superior court abused its discretion in declining to award enhanced attorney's fees. We therefore affirm the superior court's award of attorney's fees.

## IV.  CONCLUSION

Although we conclude that a claim for an employer's failure to reasonably accommodate an employee's disability is viable under AS 18.80.220, we AFFIRM the judgment rejecting Moody's AS 18.80.220 disability claim and AFFIRM the Civil Rule 82(b)(2) award of attorney's fees to DNR.

---

**57.** See *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978).

**58.** *Crisp v. Kenai Borough Sch. Dist.*, 587 P.2d 1168, 1169 (Alaska 1978).

**59.** *Rosen v. State Bd. of Public Accountancy*, 689 P.2d 478, 482 (Alaska 1984); *see also Van Huff v. Sohio Alaska Petroleum Co.*, 835 P.2d 1181, 1188 n. 7 (Alaska 1992).

**60.** Alaska R. Civ. P. 82(b)(2).

**61.** Alaska R. Civ. P. 82(b)(3).

**62.** *Babinec v. Yabuki*, 799 P.2d 1325, 1337 (Alaska 1990).