118 F.3d 92
 6 A.D. Cases 1685, 23 A.D.D. 180, 10
NDLR P 139
 Matthew T. STONE, Plaintiff-Appellant,
v.
CITY OF MOUNT VERNON and James Gleason, Individually and as
Commissioner of the Fire Department of the City of
Mount Vernon, New York, Defendants-Appellees.
 No. 1158, Docket 96-7976.
 United States Court of Appeals,
Second Circuit.
 Argued April 3, 1997.
Decided June 30, 1997.
 
 Donald L. Sapir, White Plains, NY (William D. Frumkin, Louis G. Santangelo, Sapir & Frumkin, White Plains, NY, on the brief), for Plaintiff-Appellant.
 Terence M. O'Neil, Mineola, NY (Ernest R. Stolzer, Richard G. Kass, Jessica S. Weinstein, Rains & Pogebrin, Mineola, NY, on the brief), for Defendants-Appellees.
 Before: OAKES, KEARSE, and ALTIMARI, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Matthew T. Stone, a firefighter employed by defendant City of Mount Vernon (the "City"), appeals from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, Judge, dismissing his complaint alleging that defendants City and Fire Commissioner James Gleason (collectively the "Fire Department" or "Department") violated his rights under, inter alia, the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (1994) ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-797b (1994) ("Rehabilitation Act") (collectively the "federal disability statutes"), principally by refusing to assign him to a light-duty position after an off-duty accident that left him a paraplegic. The district court granted summary judgment dismissing the complaint on the ground that no rational trier of fact could conclude that Stone was able to perform the essential functions of the job of firefighter, and therefore he was not qualified within the meaning of the federal disability statutes. On appeal, Stone contends principally that summary judgment was improper because there were genuine issues of fact to be tried as to whether fire suppression is an essential function of a position in certain of the Department's specialized bureaus, and whether the Department could reasonably accommodate his disability by assigning him to such a position. For the reasons that follow, we agree, and we therefore vacate the judgment of the district court and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 The events leading to this litigation are largely undisputed. The record, taken in the light most favorable to Stone as the party opposing summary judgment, with all permissible inferences drawn in his favor, reveals the following.
 
 A. The Events
 
 3
 The City's Fire Department employs 109 firefighters. It has mutual-aid agreements with neighboring towns for assistance during multi-alarm fires. To the extent pertinent here, the Department has two "light-duty" bureaus: the Fire Alarm Bureau ("FAB") and the Fire Prevention Bureau ("FPB"). The duties of employees assigned to FAB include receiving and transmitting alarms of fires, answering telephones, and performing related paperwork; firefighters assigned to FAB assist non-firefighter dispatchers in dispatching firefighters to calls for service. The principal duties of employees assigned to FPB are enforcing the New York State Uniform Fire Prevention and Building Code and the Department's Fire Prevention Code, reviewing architectural plans and designs, meeting with builders, and performing inspections of buildings. Firefighters assigned to FPB may also be called upon to serve as guides to assist mutual-aid fire companies by meeting them at the City's border and leading them to the site of the fire; the guide travels either in the visiting fire rig or in a separate car.
 
 
 4
 Stone was hired by the Department in January 1990 and entered service as an active firefighter; he was assigned to fire-suppression duties, which principally include extinguishing fires, entering burning buildings, and performing rescues. In December 1992, while off-duty, he was helping friends to remove from a house a tree that had been uprooted by a storm; the tree suddenly sprang upright, throwing Stone to the ground. He sustained injuries inducing paraplegia, and was initially paralyzed from the waist down. After undergoing physical rehabilitation, Stone is able, with the assistance of leg braces, to walk for a few hours at a time. He also uses a wheelchair, in which he can negotiate curbs and ramps; and he has a car that is outfitted with special hand controls that enable him to drive. Stone can get into and out of his car and his wheelchair without assistance. He is also able to climb and descend stairs out of his wheelchair while pulling the chair along with him.
 
 
 5
 Since his accident, Stone has remained an employee of the Department, on leave of absence with pay, thanks to contributions of accrued paid leave by his fellow firefighters. During this time, he has served as an instructor at the Westchester County Career Chiefs' Fire Academy, where he teaches fire-and-rescue-related courses to probationary firefighters from Westchester County. As an adjunct instructor at the New York State Fire Academy, he has taught a similar course to probationary firefighters from around New York State.
 
 
 6
 In November 1994, Stone, who passed an examination qualifying him for promotion to lieutenant, requested that he be returned to active duty and assigned a position in which his disability could be accommodated. His request identified FAB as one possible assignment. Stone received no response to his request. After attempting unsuccessfully to get a response, he wrote to Commissioner Gleason in January 1995, renewing his requests. In May 1995, Stone was informed that he would not be accommodated and that he could not return to work.
 
 B. The Present Litigation
 
 7
 Stone commenced the present action in October 1995, alleging principally that defendants' refusal to accommodate his disability by giving him a light-duty assignment, such as to FAB, violated his rights under the federal disability statutes. The complaint alleged that a February 1994 Department order stated (a) that Department members who were hired after July 1993 or who were injured in the line of duty and assigned to light duty were to be assigned to FAB as needed, and (b) that other Department firefighters not within those categories could request assignment to FAB; such requests would be granted at the discretion of the commissioner. The complaint alleged that Stone was qualified to perform the essential functions of a position in FAB and other light-duty positions.
 
 
 8
 Following a period of discovery, defendants moved for summary judgment dismissing the complaint. Relying principally on affidavits of Commissioner Gleason, defendants argued that all of the Department's active firefighters, regardless of the bureau to which they are assigned, must be available and ready to perform fire-suppression duties. According to Gleason, the Department's 109-firefighter staff was "thinly spread"; there was "no possibility of increasing the firefighting force beyond 109, because of budget constraints"; in Gleason's "opinion, the Mount Vernon Fire Department would not be able to provide satisfactory public safety services if it did not have the flexibility to assign Fire Prevention Bureau firefighters to firefighting duties when necessary"; and "a reduction of the number of firefighters available to fight fires would be unnecessarily dangerous." (Affidavit of James D. Gleason, dated June 7, 1996, p 20.) Further, according to Gleason, it was the Department's practice to assign only two categories of firefighter to FAB: (a) those who were unable to perform regular duties because of an on-duty injury and were statutorily entitled to receive full salary indefinitely, and who would therefore otherwise collect a salary without working, and (b) those who had suffered disabling off-duty injuries that were temporary. (Id. p 11.) Stone, with a permanent injury suffered while he was off duty, did not fit into either category. Firefighters assigned to FPB included both those who had been injured on the job and those who were not injured but could fulfill the bureau's personnel needs. (Id. p 17.)
 
 
 9
 Gleason acknowledged that at or after the end of 1994, two vacancies had occurred in FPB. He testified that he did not consider Stone for assignment on either occasion because the Department's policy was to assign to that bureau "a full-time firefighter"; he stated, "It doesn't come across my mind to put Mr. Stone in there because he's not at this time capable of doing fire duties." (Deposition of James D. Gleason, April 12, 1996, at 128.)
 
 
 10
 In opposition to defendants' summary judgment motion, Stone argued principally that fire suppression is not an essential function of a position in FAB or FPB and that the Department could reasonably accommodate his disability by assigning him to either of those bureaus. He submitted an affidavit describing his physical abilities and the responsibilities of firefighters assigned to those bureaus and stating his view that he could perform those assignments. He stated that defendants had never conducted or requested an examination of him to determine his physical capabilities, mobility, or ability to perform in FAB or FPB. (Affidavit of Matthew T. Stone dated June 26, 1996, p 12.)In support of his contention that fire suppression is not an essential function of a FPB position, Stone cited the deposition testimony of former FPB members John Koch and Nicholas Ionta. Koch, who entered service as a firefighter in 1972, was first assigned to FPB temporarily after hurting his back while on duty. He was reassigned to active duty after his injury healed, but thereafter, in or around 1985, he was assigned to FPB permanently and continued to serve in FPB at the time of his 1996 deposition. Koch testified that during all his years in FPB, he once, while a guide, operated a firehose at a major fire, without being asked to do so; while assigned to FPB, he never operated a pumping engine at a fire, never performed salvage operation at a fire, never rescued anyone from a burning building; he was never called to engage in fire-suppression activities.
 
 
 11
 Ionta entered service as a firefighter in 1959 and was transferred into FPB in the early 1970s following an automobile accident that occurred after he inexplicably passed out while driving. He remained assigned to FPB until he retired at the end of 1994. Ionta testified that during his more than 20 years in FPB, he served as a guide for mutual-aid fire companies, but he never was called upon to fight a fire.
 
 
 12
 Stone also cited the deposition testimony of the Department's Chief of Operations Henry Campbell, who viewed Stone as well qualified for assignment to FAB but who, with the agreement of the commissioner, had decided not to assign Stone to that bureau. Campbell expressed concern that such an assignment might in the future require the Department either to hire persons who were not as well qualified as Stone or to overload those bureaus with disabled individuals. Campbell testified as follows:
 
 
 13
 I don't think there's a finer young person I ever met than Matt [Stone] and I think he would be an asset up there. I just envisioned what happens or what would happen down the road. Would we be forced to put everybody that got hurt there? Would it open the door for individuals who may already have some sort of a physical--a physical handicap who are not capable of meeting this standard ..., but then would that allow them, now that I took care or assigned Matt to the Fire Alarm Bureau as a dispatcher, would that allow somebody to show up and say that I want to take this exam and I want that same kind of job? Those were the things that compounded our ... reasoning....
 
 
 14
 ....
 
 
 15
 [W]e can't accommodate ten people or five people, and that's what the difficulty is. That's really what it comes down to.
 
 
 16
 Can we accommodate Matt Stone up there? I certainly can. I certainly can. [ sic] And do we need him up there? Yeah, we need him.
 
 
 17
 (Deposition of Henry Campbell, April 9, 1996 ("Campbell Dep."), at 128, 143 (emphasis added).)
 
 
 18
 In a decision announced from the bench on July 12, 1996, the district court granted defendants' motion for summary judgment. The court stated that it "recognize[d] that a determination of essential job functions is a factual one," but it concluded that the record before it "demonstrate[d] that no rational fact-finder could conclude that Mr. Stone is capable of performing the essential functions of the job of firefighter in Mount Vernon." (Transcript, July 12, 1996 ("Tr."), at 15.) Although the court "conclude[d] that [Stone] is capable of performing most, if not all, of the tasks required of firefighters assigned either to the FPB [or] FAB with reasonable accommodation and therefore would be qualified for such an assignment" (id. at 13), the court agreed with defendants "that climbing ladders and entering burning buildings and performing salvage operations at fires are functions which are at the core of a firefighter's training, and that these responsibilities are inherent in any description of a firefighter's job, and to remove them would be to redefine the nature of the job" (id. at 12 (internal quotation marks omitted)). The court "assume[d] that there may be several firefighters assigned to the FPB who have never been called upon to fight a fire" (id. at 13), and it found that "certain individuals assigned to [FPB and FAB] find most of their time committed to other tasks, such as inspections and alarm tracking" (id. at 16), but the court emphasized that "they were hired for their firefighting capabilities and as firefighters" (id.). Pointing to the Gleason affidavit, the district court concluded that "[t]he fluctuating demands of the Fire Department suggest that firefighting capabilities are essential in the event there should be a major fire, or riot, or natural disaster, or some other situation which required every person in the Fire Department to respond" (id. at 17), and that "the emergency nature of the Fire Department's responsibilities requires that all these persons temporarily or permanently assigned to [FPB or FAB] be able to undertake firefighting, when and if it becomes necessary" (id. at 17-18). The court thus concluded that Stone "ha[d] not shown to the satisfaction of this Court for purposes of this statute that he is capable of performing the essential functions of a firefighter." (Id. at 19-20.)
 
 
 19
 Judgment was entered dismissing the complaint in its entirety, including a state law claim that was dismissed without prejudice. This appeal followed.
 
 II. DISCUSSION
 A. The Federal Disability Statutes
 
 20
 The regulatory schemes of the ADA and the Rehabilitation Act are similar. The ADA prohibits covered employers from discriminating against an otherwise qualified employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute defines "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8) (emphases added). The ADA defines the term "discriminate" to include
 
 
 21
 not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business.
 
 
 22
 42 U.S.C. § 12112(b)(5)(A) (emphases added).
 
 
 23
 The Rehabilitation Act prohibits disability-based discrimination by government agencies and other recipients of federal funds. Section 504(a) of that Act provides that
 
 
 24
 [n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 25
 29 U.S.C. § 794(a). Regulations promulgated by the Department of Health and Human Services under this statute define a "qualified" person with a disability as one "who, with reasonable accommodation, can perform the essential functions of the job in question." 45 C.F.R. § 84.3(k)(1) (1996) (emphases added). These regulations require recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped ... employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program," id. § 84.12(a) (emphases added). See also Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir.1991).
 
 
 26
 The terms common to both regulatory schemes are to be interpreted in the same way. See, e.g., 42 U.S.C. § 12117(b) (federal agencies administering federal disability statutes are to avoid subjecting employment discrimination claims to "inconsistent or conflicting standards"); 29 U.S.C. § 794(d) (Rehabilitation Act is to be interpreted in accordance with the standards applied under the ADA); Lyons v. Legal Aid Society, 68 F.3d 1512, 1515 (2d Cir.1995); Staron v. McDonald's Corp., 51 F.3d 353, 355-56 (2d Cir.1995). Thus, a plaintiff can establish a prima facie case under either statute by showing (1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations. See, e.g., Lyons v. Legal Aid Society, 68 F.3d at 1515. The employer can defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship would be undue. The burden of proof on these two issues is on the employer. See, e.g., Borkowski v. Valley Central School District, 63 F.3d 131, 138 (2d Cir.1995) ("Borkowski ").
 
 
 27
 In the present case, the questions center on the meanings of "essential [job] functions," "reasonable accommodation," and "undue hardship."
 
 
 28
 1. "Essential Functions"
 
 
 29
 The term "essential functions," which is not defined in the statutes themselves, is generally defined in ADA regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") to mean the "fundamental" duties to be performed in the position in question, but not functions that are merely "marginal," 29 C.F.R. § 1630.2(n)(1) (1996). The regulations also provide illustrations of the reasons that a given function may be found to be fundamental to the position and examples of evidence that may be considered in making that finding:
 
 
 30
 Essential functions--(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.
 
 
 31
 (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
 
 
 32
 (i) The function may be essential because the reason the position exists is to perform that function;
 
 
 33
 (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
 
 
 34
 (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.
 
 
 35
 (3) Evidence of whether a particular function is essential includes, but is not limited to:
 
 
 36
 (i) The employer's judgment as to which functions are essential;
 
 
 37
 (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
 
 
 38
 (iii) The amount of time spent on the job performing the function;
 
 
 39
 (iv) The consequences of not requiring the incumbent to perform the function;
 
 
 40
 (v) The terms of a collective bargaining agreement;
 
 
 41
 (vi) The work experience of past incumbents in the job; and/or
 
 
 42
 (vii) The current work experience of incumbents in similar jobs.
 
 
 43
 29 C.F.R. § 1630.2(n). Plainly, the considerations set out in this regulation are fact-intensive. Usually no one listed factor will be dispositive, and the regulations themselves state that the evidentiary examples provided are not meant to be exhaustive.
 
 
 44
 2. "Reasonable Accommodation"
 
 
 45
 With respect to the term "reasonable accommodation," the ADA sets out a nonexclusive list of different methods of accommodation encompassed by the term "reasonable accommodation," stating that
 
 
 46
 [t]he term "reasonable accommodation" may include--
 
 
 47
 ....
 
 
 48
 (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations for individuals with disabilities.
 
 
 49
 42 U.S.C. § 12111(9) (emphases added). The ADA regulations state that the employer is required to provide
 
 
 50
 (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or(iii) Modifications that enable a[n] ... employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.
 
 
 51
 29 C.F.R. § 1630.2(o)(ii) and (iii). This description too is nonexclusive; the EEOC notes that "[t]here are any number of other specific accommodations that may be appropriate for particular situations but are not specifically mentioned" in § 1630.2(o). EEOC, Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. at 344 (1996). An accommodation is "reasonable," however, "only if its costs are not clearly disproportionate to the benefits that it will produce." Borkowski, 63 F.3d at 138.
 
 
 52
 As to the requirement that the requested accommodation be reasonable, "we have held that the plaintiff bears only a burden of production." Id.; see Gilbert v. Frank, 949 F.2d at 642. This burden "is not a heavy one.... It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Borkowski, 63 F.3d at 138. Having accomplished this, a plaintiff will have made a prima facie showing that a reasonable accommodation is available and the burden of nonpersuasion will shift to the defendant. See id.; Gilbert v. Frank, 949 F.2d at 642. The defendant must then show that the accommodation is not reasonable, or that it imposes an undue hardship, which "in practice ... amount to the same thing." Borkowski, 63 F.3d at 138 (collecting cases).
 
 
 53
 3. "Undue Hardship"
 
 
 54
 In providing that discrimination includes an employer's failure to make a reasonable accommodation "unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]," 42 U.S.C. § 12112(b)(5)(A), the ADA defines "undue hardship" as follows:
 
 
 55
 (A) In general
 
 
 56
 The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).
 
 
 57
 (B) Factors to be considered
 
 
 58
 In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--
 
 
 59
 (i) the nature and cost of the accommodation needed under this chapter;
 
 
 60
 (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
 
 
 61
 (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
 
 
 62
 (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.
 
 
 63
 42 U.S.C. § 12111(10).
 
 
 64
 We have noted that " 'undue' hardship, like 'reasonable' accommodation, is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also the benefits to others that will result." Borkowski, 63 F.3d at 139; see also 42 U.S.C. § 12101(a)(9) (purposes of ADA include providing individuals with disabilities an equal opportunity to pursue employment opportunities and reducing societal cost of dependency and nonproductivity).
 
 
 65
 The burden on the employer, then, is to perform a cost/benefit analysis. In a sense, of course, that is what the plaintiff also had to do to meet her burden of making out a prima facie case that a reasonable accommodation existed. But while the plaintiff could meet her burden of production by identifying an accommodation that facially achieves a rough proportionality between costs and benefits, an employer seeking to meet its burden of persuasion on reasonable accommodation and undue hardship must undertake a more refined analysis. And it must analyze the hardship sought to be imposed through the lens of the factors listed in the regulations, which include consideration of the industry to which the employer belongs as well as the individual characteristics of the particular defendant-employer. If the employer can carry this burden, it will have shown both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made.
 
 
 66
 Borkowski, 63 F.3d at 139. However, we have "not at all intend[ed] to suggest that employers ... must analyze the costs and benefits of proposed accommodations with mathematical precision." Id. at 140.
 
 B. Summary Judgment Principles
 
 67
 We review a district court's grant of summary judgment de novo. See, e.g., Gallo v. Prudential Residential Services, Limited Partnership, 22 F.3d 1219, 1223 (2d Cir.1994). A motion for summary judgment may not be granted unless the court has determined that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed.R.Civ.P. 56(c). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989).
 
 C. The Record in the Present Case
 
 68
 In the present case, we have several difficulties with the granting of summary judgment in light of the above regulations and the record created thus far. First, in ruling that Stone was incapable of performing the essential functions of the position he sought, the district court gave undue weight to the title "firefighter," emphasizing that firefighters who had been assigned to FAB and FPB "were hired for their firefighting capabilities and as firefighters" (Tr. at 16). We in no way suggest that the essential duties of a firefighter do not normally include fighting fires. However, proper analysis of a claim under the federal disability statutes, must be focused on "the fundamental job duties of the employment position the individual with a disability ... desires," 29 C.F.R. § 1630.2(n)(1) (emphasis added), rather than solely on the title held by a person occupying that position or the other positions occupied by most persons holding that title. The court should have focused more closely on the job duties of firefighters assigned to FAB or FPB.
 
 
 69
 Second, the district court appears to have relied exclusively on the commissioner's opinion that the Department's capacity to fight multi-alarm fires would be unduly hampered by having assigned to FAB or FPB a firefighter who could not engage in fire-suppression activity. While plainly the "employer's judgment as to which functions are essential," 29 C.F.R. § 1630.2(n)(3)(i), is highly relevant evidence, it is only one of the regulations' seven illustrative categories of evidence, and it is the only category in the present case to suggest that the ability to extinguish fires, enter burning buildings, and perform rescues is an essential function of a firefighter assigned to FAB or FPB. So far as this record shows, for example, there are no job descriptions and no collective bargaining agreement provisions with respect to those bureaus that require fire-suppression activities. And although the court credited Gleason's opinion that in the event of a major fire the Department needed to be able to call upon "every person in the Fire Department to respond" (Tr. at 17), the present record indicates that, as a matter of practice, firefighters assigned to FAB or FPB simply have not been called upon to fight fires. Whenever the Department's own on-duty force has appeared to be insufficient to suppress a fire, the Department's standard practice has been to call in mutual-aid fire companies from neighboring towns, not to request that FAB or FPB members suit up to suppress the fire. (Indeed, the record indicates that the Department calls in mutual-aid fire companies in preference even to summoning off-duty members of its own force unless they have volunteered for overtime work.) Koch and Ionta, for example, with a total of 30 years' service in FPB between them, were never once called upon for fire-suppression activities. And we have seen in the record no evidence that any other person assigned to FPB or FAB was ever called on for fire-suppression activities. Plainly, therefore, it cannot be said that the reason the FAB and FPB positions exist is to perform the fire-suppression function, or that the incumbents are assigned to those positions because of their ability to perform a fire-suppression function.
 
 
 70
 A function is, by definition, not "essential" to a position if that function is "marginal," and the evidence that neither the past nor the incumbent firefighters assigned to those bureaus have ever been requested to engage in a fire-suppression activity suggests that it would be entirely permissible for a factfinder to infer that the ability to engage in fire-suppression activities is marginal to the positions in FAB and FPB.
 
 
 71
 Nor do we see in the present record any basis on which it could be held as a matter of law that assignment of Stone to FAB or FPB would be an accommodation that was not "reasonable." The record indicates that in 1992-1996 some 15-20 firefighters were assigned to one of these bureaus following injuries. Though most of these assignments apparently were temporary, plainly the 10- and 20-year assignments of Koch and Ionta, respectively, suggest that career placement in those bureaus is not unprecedented.
 
 
 72
 Further, in order to establish prima facie that the accommodation requested was reasonable, Stone need show only that the cost of assigning him to one of those bureaus would not clearly exceed its benefits. The present record plainly would support a finding that the assignment would benefit Stone; and the testimony of operations chief Campbell clearly indicated that Stone's productivity in such a position would benefit not only society, but the Department itself as well:
 
 
 73
 I don't think there's a finer young person I ever met than Matt [Stone] and I think he would be an asset up there....
 
 
 74
 ....
 
 
 75
 Can we accommodate Matt Stone up there? I certainly can. I certainly can. [sic ] And do we need him up there? Yeah, we need him.
 
 
 76
 (Campbell Dep. at 128, 143.)
 
 
 77
 As for the cost of such an assignment, there apparently would be little or no monetary cost, since the commissioner has stated that the Department's budget constraints would foreclose the hiring of a 110th firefighter. The "cost" pointed to by the Department is the loss of its ability to call upon one member of FAB or FPB to engage in fire-suppression activity. This of course expresses an important concern in a matter of public safety. But in light of the present record suggesting that such a call has never been made on anyone assigned to that bureau in the past, the inability to call upon Stone in the future is a highly speculative loss of resource that cannot be said to exceed, as a matter of law, the concrete benefits of the assignment.
 
 
 78
 In sum, while it surely is not unreasonable for the Department to distinguish between temporary and permanent assignments, the present record equally surely does not permit the conclusion that making a permanent assignment to Stone would be an accommodation that was unreasonable as a matter of law. We conclude that the evidence of record sufficed to show that Stone presented a prima facie case under the federal disability statutes.
 
 
 79
 Finally, we note that notwithstanding the commissioner's opinion that the Department needed to have FAB and FPB firefighters available to carry out fire-suppression duties, the present record does not come close to meeting the Department's burden of showing that making the accommodation of assigning Stone to one of those bureaus would be a hardship on the Department that would be "undue." The concern expressed by Campbell that operations would be hampered if the Department were forced to hire disabled persons not as well qualified as Stone or were forced to hire 5-10 disabled persons is not material to the present case. Each request for a reasonable accommodation under the federal disability statutes must be decided on the basis of the existing circumstances. To the extent that an employer has needs for a number of persons who have no disability, the number of employees already on staff who had disabilities would be a material factor to be considered. The suggestion that hiring 5-10 disabled persons would be an undue hardship is not a defense when the employer has hired none.
 
 CONCLUSION
 
 80
 In sum, on the basis of the present record, a reasonable factfinder could infer that, for a Department that (a) has periodically assigned disabled employees to FAB or FPB, and (b), so far as the record shows, has never once asked any employee, of either of those bureaus, whether disabled or not, and whether assigned temporarily or permanently, to engage in fire-suppression activity, the assignment to either bureau of a single disabled employee whose only limitation is that he cannot engage in fire-suppression activity is neither an accommodation that would be unreasonable nor a hardship that would be undue. We therefore vacate the judgment dismissing the complaint and remand for further proceedings not inconsistent with this opinion. We do not view our decision on this appeal as precluding a judgment as a matter of law upon further development of the record.
 
 
 81
 The district court also dismissed Stone's state-law claim, declining to exercise supplemental jurisdiction over it because of the dismissal of the federal claims. In light of our reinstatement of the federal claims, we also vacate the dismissal of the state-law claim.
 
 
 82
 Costs to plaintiff.