Patricia A. PENDER, Plaintiff,

v.

DISTRICT COUNCIL 37 OF THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, Defendant.

No. 00 CIV. 5402(DC).

United States District Court,
S.D. New York.

Sept. 30, 2002.

Roberto Campos–Marquetti, P.C., By Roberto Campos–Marquetti, Esq., New York, Bevans & Katten, L.L.P., By Judith Katten, Esq., New York, for Plaintiff.

Robinson & Cole L.L.P., By Michael B. Golden, Esq., Katherine C. Glynn, Esq., New York, for Defendant.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Patricia A. Pender contends that her former employer, defendant District Council 37 ("DC 37") of the American Fed-

eration of State, County, and Municipal Employees (the "AFSCME"), terminated her employment because of her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and New York law.

DC 37 moves for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing the complaint, relying on an arbitrator's decision rejecting a grievance that Pender had filed, with the assistance of her union, under a collective bargaining agreement. For the reasons that follow, I conclude that the arbitrator's decision is entitled to great weight and that no jury could reasonably conclude, on the basis of the record before the Court, that Pender's rights under the ADA and New York law were violated. Accordingly, the motion is granted and judgment will be entered dismissing the complaint.

### BACKGROUND

#### A. The Facts

Many of the facts are not in dispute, and, for purposes of this motion, the facts that are in dispute are construed in the light most favorable to Pender as the party opposing summary judgment. The facts are as follows:

#### 1. Plaintiff's Employment

DC 37 is a division of a labor union, the AFSCME. (Compl.¶ 4). On September 1, 1995, Pender began working as a Council Representative in DC 37's hospitals division. (Compl.¶ 10). Pender is a member of a union herself, the Federation of Field Representatives and Municipal Employees Legal Services Staff Association, the exclusive collective bargaining unit for all Council Representatives. (DX 1 at 1).[1]

---

**1.** References to "PX" and "DX," respectively, are to plaintiff's exhibits and defendant's exhibits submitted in connection with this motion. DX 4 consists of the exhibits submitted during the arbitration as union exhibits and

these are referred to as "DX 4, at U-." DX 5 consists of the exhibits submitted during the arbitration as employer exhibits and these are referred to as "DX 5, at E-." DX 6 consists of

As described in a job posting, the "typical tasks" of the Council Representative position include: (1) handling grievances for DC 37 members; (2) visiting various assigned locations to address members' work complaints; (3) arranging and attending hearings, labor-management meetings, and arbitrations; (4) scheduling meetings with members; (5) compiling reports; and (6) coordinating collective bargaining proposals for DC 37 branches. (DX 6, at J2; *see also* Arb. Tr. at 493 (Brooks describing as "important duties")). DC 37 has a total of approximately ten Council Representatives and grievance representatives in its hospitals division to service 10,000 workers employed in fifteen municipal hospitals, five diagnostic and treatment centers, and six medical examiner offices or mortuaries. (Arb. Tr. at 448–49).

The Council Representative job in the hospitals division is a "very demanding," "very strenuous, hard job." (Arb. Tr. at 452). Council Representatives must service members who work round the clock, as there are three shifts each day, although Council Representatives could schedule meetings with night shift employees during the day as well. (Pender Dep. at 42). Pender was advised when she took the position that "this was not a nine to five job," although a 12–hour work day was "not the norm." (*Id.* at 455–59; Brooks Dep. at 27).

Council Representatives represent members in disciplinary hearings and grievances. To do so they must investigate matters, often by actually visiting the areas of the hospitals where the alleged infractions occurred, including patient care areas. The Council Representatives conduct regular chapter meetings and attend many other meetings, sometimes at odd

the exhibits submitted during the arbitration as joint exhibits and these are referred to as

hours. They must be "visible" to members. Often Council Representatives must attend demonstrations and participate in picket lines and distributions of leaflets. Most of their time is spent in the field as opposed to at headquarters. (*Id.* at 452–70).

Before her illness, Pender did all of these things. (*Id.* at 471). As a Council Representative, Pender was assigned primarily to three facilities located in Brooklyn—Kings County Mortuary, East New York Diagnostic and Treatment Center, and Brooklyn Central Laundry. (Pender Dep. at 25). She traveled to these locations on a regular basis. (*Id.* at 25–31). In addition, she attended hearings at City Hall and organizing meetings and demonstrations, and she passed out leaflets at assigned facilities. (*Id.* at 21). She had other responsibilities as well, such as delivering food at membership meetings. (*Id.* at 38). According to her supervisor, Pender was a "good worker." (Brooks Dep. at 47).

### 2. *Plaintiff's Disability*

Pender developed a liver condition, and on October 30, 1997, she commenced a medical leave of absence. On November 5, 1997, she received a liver transplant. (Compl.¶14). She did not return to work until October 13, 1998, and thus she was out for almost one year. (Compl. ¶ 15; DX 6, at J11). During this leave of absence, she was paid her full salary. (Arb. Tr. at 480–81).

Upon returning to work on October 13, 1998, Pender advised her supervisors that she could no longer lift heavy items, work in inclement weather, or drive long distances. (Arb. Tr. at 481). She asked to work only three days a week; DC 37

"DX 6, at J-."

accommodated her by placing her on a part-time modified assignment that could be carried out from a desk. (Arb. Tr. at 481–82). Indeed, DC 37 agreed that: (a) Pender would have to work only three days a week, from 9 a.m. to 3:30–4 p.m.; (b) she would have to work only from office headquarters; (c) she would not be required to lift or distribute leaflets, except in a "dire emergency"; and (d) she would be "exempt from attending rallies/demonstrations, early morning leaflet distributions and assignments." (DX 6, at J12). DC 37 agreed to this arrangement through December, after which Pender would have to return to her "normal assignment." (Brooks Dep. at 55). Notwithstanding these accommodations, Pender was to receive the salary and expenses of a full-time Council Representative. (Arb. Tr. at 480–82).

Shortly after she returned to work, Pender was examined by Dr. Chaim Reich, a physician selected by DC 37. (Compl.¶16). By letter dated October 21, 1998, Dr. Reich informed DC 37's personnel director, Amy Kadlub, that Pender was "totally disabled" and could not return to her "previous duties." (DX 5, at E1).

On November 2, 1998, less than three weeks after returning to work on a part-time basis, Pender became ill and was "rushed" to the hospital. (DX 6, at J15, J16). She was readmitted to the hospital, remained for five days, and recommenced her sick leave, with sick pay. (Arb. Tr. at 57, 171–74; Pender Dep. at 151–52).

### 3. *The Termination of Plaintiff's Employment*

On January 6, 1999, DC 37 sent a letter to Pender, who had not returned to work, stating that based upon Dr. Reich's evaluation, Pender "could be presumed" to be "permanently disabled" and unable to work. (DX 6, at J17). The letter indicated that Pender's position as Council Representative could not be held for her "indefinitely" and that if she wanted to continue on "approved paid sick leave" she would have to file for disability with the Social Security Administration. (*Id.*). In other words, if Pender could not work, she could be continued on "approved paid sick leave," but she had to file an application for Social Security benefits. (*See* Arb. Tr. at 638–40).

Pender responded by letter dated January 14, 1999. (DX 6, at J18). The letter did not indicate whether Pender was ready, or wanted, to return to work. Rather, Pender stated that she was "unable" to inform DC 37 of her plans and requested a meeting with DC 37, which her representative from her union would attend. (*Id.*). Pender did *not* disclose in her January 14, 1999 letter that she had just seen her doctor at Mount Sinai and that he had signed a form on January 13, 1999 stating that she could return to her "usual work" on February 16, 1999. (*Compare* DX 6, at J18, *with* DX 6, at J14; *see also* Arb. Tr. at 223–24).

By letter dated January 19, 1999, Kadlub—who was unaware that Pender had been deemed able to return to work on February 16, 1999—informed Pender that DC 37 could no longer keep her position open, as she had been unable to work full-time since October 30, 1997. The letter advised Pender that she would be removed from the payroll effective February 12, 1999. (DX 6, at J19). Kadlub sent the letter because she believed Pender could not perform the job and she believed the job was "too strenuous" for Pender. (Arb. Tr. at 613–15). Kadlub's thinking was influenced by the fact Pender "had been accommodated before and couldn't do the job even with accommodation." (*Id.* at 614).

### 4. The Question of Reasonable Accommodation

On January 29, 1999, ten days *after* Kadlub had written her letter terminating Pender's employment, the Clinical Coordinator at Mount Sinai, a nurse, wrote a letter to Kadlub advising that Pender's condition "was improving" and that she was "medically fit" to return to work on February 16, 1999. (DX 6, at J20). The Coordinator noted that Pender would be able to perform "all the major functions of her job, with some accommodation to her permanent disability." (*Id.*).

In response to the January 29th letter, by letter dated February 17, 1999, Kadlub asked Pender for a list of the accommodations she was requesting. (DX 6, at J23). Pender did not respond for six weeks. By letter dated March 30, 1999, Pender wrote back, but even then she did not identify the reasonable accommodations she needed. Rather, she stated that she was prepared to identify the reasonable accommodations she needed, but she would not do so without a meeting first. (DX 6, at J24). In fact, no meeting was ever held and Pender never advised DC 37 of the accommodations she needed. (Arb. Tr. at 250–54, 576).

In the meantime, Pender had consulted with a private attorney, who wrote a letter to Kadlub on February 10, 1999, some three weeks after Pender's employment had been terminated. The letter threatened litigation and requested that DC 37 "rescind" its "unlawful personnel action" of removing Pender from the payroll. The letter suggested a meeting to discuss a resolution of the matter. (DX 6, at J21). DC 37's counsel responded by letter dated February 11, 1999. Counsel stated that the termination was "lawful," but nonetheless offered to meet to "review" the mat-

ter. (DX 6, at J22). Pender's counsel, however, never told her that DC 37 was willing to meet with her and no meeting was ever held. (Arb. Tr. at 194–96, 259–60).

### 5. Plaintiff's Admissions

Pender has made certain statements under oath or penalty of law or through counsel that were inconsistent with her contention that she was able to perform the essential functions of her job, with reasonable accommodation.

First, at the same time that she was corresponding with DC 37 about returning to work, Pender submitted an application to the Social Security Administration for disability benefits. (DX 4, at U9). In the application, which is dated February 12, 1999, Pender affirmed, under penalty of law, that:

> I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON November 1, 1997. I AM STILL DISABLED.

(*Id.*). Pender did not disclose to DC 37 that she had filed for Social Security disability benefits. (Arb. Tr. at 639).[2]

Second, in her responses to interrogatories in this case, Pender wrote that she:

> is substantially limited in the major life activity of working in that she is significantly restricted in the ability to perform a class of jobs because of her inability to be exposed to hospital and medical facilities as well as other facilities that treat patients that have or may have infectious diseases.

(DX 5, at E7 (Resp. to Interrog. 2(ii))).

Third, in a malpractice action that she brought against the physicians and hospital who prescribed the drug that apparent-

---

**2.** Pender also testified that she had applied for Social Security disability benefits in January 1999. The application was denied and she appealed, but the record is unclear as to what happened with respect to the appeal. (Arb. Tr. at 227–29).

ly caused her liver failure, she stated in response to a bill for particulars:

> Plaintiff is permanently disabled from returning to her employment and has not worked since November 4, 1997.

(DX 5, at E5B (Resp. to Bill of Partic. 13(c))). The responses were signed by Pender's malpractice attorneys on October 18, 1999.

### 6. *The Grievance Arbitration Proceedings*

On April 7, 1999, Pender, through her union representative, filed a grievance under the terms of her collective bargaining agreement (the "CBA") based on the termination of her employment. (DX 6, at J25). Pender alleged that DC 37 had violated the CBA by terminating her employment because of her disability, but she also specifically alleged that in doing so DC 37 had violated the ADA as well as the New York State Human Rights Law.[3] (DX 2 at 10 (Pender's Post Hearing Brief submitted in the arbitration proceedings)).

The grievance proceeded to arbitration before Bonnie Siber Weinstock, an experienced labor arbitrator. (DX 8). Hearings were held on February 4 and July 10, 2000, and April 5 and June 5, 2001. The parties presented documentary and testimonial evidence and examined and cross-examined witnesses under oath. The arbitration proceedings were transcribed (at least in part) and the transcript has been made a part of the record before this Court. (DX 3).[4] Pender was represented during the arbitration by her union's lawyers, who had extensive experience in employment discrimination mat-

ters. In addition, her private attorneys— the same attorneys who represent her in the instant lawsuit—attended the third and fourth sessions. (Arb. Tr. at 212, 385). Union counsel represented that Pender's private counsel would be assisting in the presentation of the evidence, and the arbitrator permitted private counsel to attend based on that representation, although she ruled that the union was to have only "one spokesperson." (*Id.* at 215–18). After the hearings were completed, the parties submitted post-hearing briefs. (DXs 2, 7).

On October 1, 2001, the arbitrator issued a 23–page opinion and award, rejecting the grievance and finding in favor of DC 37. (DX 9). The arbitrator concluded that DC 37 did not violate the CBA by terminating Pender's employment because she was unable to perform the duties and responsibilities of a Council Representative, even with reasonable accommodations. (*Id.*). The arbitrator specifically addressed Pender's ADA claim on the merits. The arbitrator assumed that Pender had a "disability" within the meaning of the ADA, but concluded that Pender "was unable to perform the essential functions of a Council Representative with or without an accommodation." (DX 9 at 15).

### 7. *The EEOC Filing*

On April 4, 2000, while the grievance arbitration proceedings were pending, Pender filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") against DC 37, alleging discrimination based on disability.

---

**3.** The relevant provision of the CBA provides that "[t]he employer shall comply with all applicable law in the area of non-discrimination in employment practices." (DX 1 at 34 (Art. XVI(J))).

**4.** As the arbitrator noted for the record on July 10, 2000, the February 4, 2000 session

was not transcribed. The proceedings that day, however, merely consisted of opening statements and colloquy, and the parties declined an opportunity to repeat their opening statements on the record on July 10, 2000. (Arb. Tr. at 3).

She received a right-to-sue letter from the EEOC on April 25, 2000.

## B. *Prior Proceedings*

On July 20, 2000, within ninety days after receipt of the right-to-sue letter, Pender commenced this action alleging that DC 37 violated the ADA and state and city law.

The Court held the initial pretrial conference in the case on November 21, 2000. The parties advised the Court that the matter was still in arbitration. The Court urged Pender to discontinue the arbitration and to proceed solely with the federal lawsuit, so that the parties would not be litigating the same case twice. (*See* 4/29/02 Tr. at 20–22).

The Court conducted a settlement conference on December 19, 2000. The efforts to settle failed and a deadline for discovery was set. The parties engaged in discovery and some of the discovery was actually used in the final arbitration sessions.

At the conclusion of discovery, this motion followed.

## DISCUSSION

DC 37's motion raises two principal issues: first, the extent to which the arbitrator's decision should be given preclusive effect in this action; and second, whether the record contains sufficient evidence from which a reasonable jury could conclude that DC 37 had violated Pender's rights under the ADA and New York law. I address these issues by first laying out the applicable law and then applying the law to the facts as summarized above.

## A. *Applicable Law*

### 1. *The Preclusive Effect of Arbitration Decisions*

In considering the preclusive effect of arbitration decisions on employment discrimination claims, I begin by briefly discussing the three leading Supreme Court decisions on the issue: *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); and *Wright v. Universal Maritime Service Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998).

In *Gardner–Denver,* the Court held that a union employee "does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." 415 U.S. at 49, 94 S.Ct. 1011. Hence, the Court held that a union employee who filed (and arbitrated unsuccessfully) a grievance alleging discrimination in violation of a collective bargaining agreement was not precluded from thereafter bringing a lawsuit under Title VII.

Seventeen years later, in *Gilmer,* the Court addressed the interplay between mandatory arbitration agreements and employment discrimination claims in the context of individual employees, *i.e.,* non-collective bargaining employees. The Court held that mandatory arbitration clauses are enforceable in this context and that an employee could waive her right to bring federal statutory claims to court. 500 U.S. at 35, 111 S.Ct. 1647.

 Finally, in 1998 in *Wright,* the Court addressed the question whether a mandatory arbitration clause in a collective bargaining context could be used to prevent an employee from bringing an employment discrimination lawsuit. The Court held that, even assuming a collective bargaining agreement arbitration clause is enforceable to compel arbitration of an employee's statutory discrimination claim, such a clause would only be enforced if it was "particularly clear" that it was intended to cover such claims. 525 U.S. at 79,

82, 119 S.Ct. 391. Hence, the Court held that a union-negotiated waiver of an employee's statutory right to a judicial forum is enforceable—if at all—only if the waiver is "clear and unmistakable." *Id.* at 80, 119 S.Ct. 391; *see Fayer v. Town of Middlebury,* 258 F.3d 117, 122–23 (2d Cir.2001); *Rogers v. New York Univ.,* 220 F.3d 73, 75–76 (2d Cir.2000).

In this case, although Pender spends a great deal of time arguing in her papers that she is not precluded from bringing this lawsuit because the arbitration clause in the CBA is not "clear and mistakable," DC 37 is not pressing this point. Rather, as it makes clear in its motion papers and as it reiterated at oral argument, DC 37 concedes that the language in the CBA does not meet the *Wright* standard and it is not arguing that the arbitrator's decision has *res judicata* effect. (4/29/02 Tr. at 8, 12; Def. Reply Mem. at 1 ("Although DC 37 may feel that it is unfair that the plaintiff has been allowed to have two bites at the apple by being allowed to litigate her claims after arbitrating them, it does not contest that the plaintiff has a legal right to litigate her claims in this Court.")).

Rather, DC 37 relies on *Gardner–Denver* itself—in particular the last two sentences of the body of the opinion:

> The federal court should consider the employee's claim *de novo.* The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.

415 U.S. at 60, 94 S.Ct. 1011. The Court then explained, in a footnote:

> We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural

fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum.

*Id.* at 60 n. 21, 94 S.Ct. 1011.

The question remains as to what "great weight" means in the context of the Court's *de novo* consideration of the statutory discrimination claim. DC 37 argues that here the arbitrator's decision should be afforded "great weight" such that Pender should be precluded from re-litigating the issues that the arbitrator decided. *See Clarke v. UFI, Inc.,* 98 F.Supp.2d 320, 336 (E.D.N.Y.2000) (because arbitral process was "procedurally fair," the issues were developed "more than adequate[ly]," and arbitrator issued "a meticulous, well-reasoned, and finally persuasive opinion," arbitrator's findings as to employee's sexual harassment allegations were given "preclusive effect").

"Great weight," however, is not the same as "beyond dispute." *Darden v. Illinois Bell Tel. Co.,* 797 F.2d 497, 504 (7th Cir.1986) (affirming grant of summary judgment based, in part, on "great weight" given to arbitrator's decision that employee was fired for just cause). In arguing that the arbitrator's decision should be given "preclusive effect," DC 37 goes too far, for such a conclusion would negate the

concept of *de novo* review. I conclude that in this context an arbitrator's decision is not entitled to preclusive effect. Rather, a court is to give the arbitral decision "great weight" as it considers the decision together with all the evidence in the record to determine whether a reasonable jury could find for plaintiff on the issue of discrimination. *Cf. Wright v. West*, 505 U.S. 277, 304, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring) (noting, in habeas context, that "*de novo* review is not incompatible with the maxim that federal courts should 'give great weight to the considered conclusions of a coequal state judiciary'") (*quoting Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). The arbitrator's decision is but one piece of evidence—albeit an important piece if it is entitled to "great weight"—to be considered in the context of the entire record.

### 2. *The ADA*

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Buckley v. Consol. Edison Co.*, 155 F.3d 150, 153–54 (2d Cir.1998). As the Seventh Circuit has noted, "Congress enacted the ADA to 'level the playing field' for disabled people. Congress perceived that employers were basing employment decisions on unfounded stereotypes." *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995).

To survive this motion for summary judgment, Pender therefore must present sufficient evidence from which a jury could find that: (1) DC 37 is covered by the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001) (citations omitted).

Here, for purposes of this motion, DC 37 concedes that Pender meets the first, second, and fourth elements. The only disputed issue is the third element—whether Pender was capable of performing the essential functions of her job as Council Representative, with or without reasonable accommodation. In particular, for purposes of this motion, the question is whether, on the record before the Court and resolving all conflicts in the evidence in her favor, a reasonable jury could find that Pender could perform the essential functions of her job, with or without reasonable accommodation.

The ADA and accompanying regulations provide some guidance. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the 'essential functions' of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions" is defined as the fundamental duties of the employment position. 29 C.F.R. § 1630.2(n)(1). Whether a particular employment function is essential must be made on a case-by-case basis, but the duty must bear more than a marginal relationship to the position at issue. *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir.1997), *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). A court will consider factors such as: (1) the employer's judgment as to which functions are essential; (2) any written job description; (3) the amount of time spent performing particular functions; and (4) whether the incumbent is required to per-

form the function. *Id.* Other helpful criteria include:

— what skills the employer has required of individuals ... in the past

— whether the reason why the position exists is to perform a particular function

. . . .

— whether there are other employees available to perform the job or to perform certain functions of the job

. . . .

— whether much skill, expertise, or a degree is required to perform a specialized task

— whether the employee can anticipate spending a good deal of time performing the particular function [or] evaluation is based on needing to meet a certain level of production, or the nature of the job.

Sharon P. Stiller, *Employment Law in New York,* § 4:135, at 277–78 (West 2001).

█ An employee's application for or receipt of Social Security disability benefits does not necessarily bar an individual with a disability from claiming, in an action under the ADA, that she can perform the essential functions of the job. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–07, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). But "the plaintiff must offer some explanation for the inconsistency. The explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in [the statement to the Social Security Administration], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir.2000) (internal quotations omitted).

## B. *Application*

### 1. *The Weight To Be Given the Arbitrator's Decision*

█ Applying the factors set forth in footnote 21 of *Gardner–Denver,* I conclude that the arbitrator's decision here is entitled to "great weight."

The collective bargaining agreement provided the full protection of the ADA and New York law, as it provided that "[t]he employer shall comply with all applicable law in the area of non-discrimination in employment practices." (DX 1 at 34 (Art. XVI(J))). The degree of procedural fairness in the arbitral forum was high and plaintiff's counsel conceded at oral argument that there were no "procedural irregularities." (4/29/02 Tr. at 22). Indeed, the proceedings were transcribed; the parties were able to submit documentary evidence; they were able to examine and cross-examine witnesses under oath; Pender was represented by experienced union counsel and her private attorneys assisted as well; and the parties were able to submit post-trial briefs. Unlike in many arbitrations, the parties also had access to discovery—their discovery in this lawsuit was available for their use at the last two arbitration sessions. The record was adequate, as the parties submitted extensive documentary and testimonial evidence. Although the arbitrator felt that evidence was lacking on the issue of Pender's disability, the arbitrator *assumed* in Pender's favor that she was a person with a disability within the protection of the ADA.

The arbitrator was an experienced arbitrator who wrote a thorough, well-reasoned, and fair 23–page decision. The issue before the arbitrator was largely one of fact, well suited for resolution in the traditional labor arbitral format—whether Pender could perform the essential functions of the Council Representative position. The arbitrator gave full consideration to Pender's ADA claim.

Finally, a significant consideration—not mentioned in *Gardner–Denver*—is that Pender commenced this action *before* the arbitration was completed. The Court urged her to withdraw the grievance and to proceed solely with this action so that the parties would not have to litigate on two fronts. (4/29/02 Tr. at 20). She chose not to do so, and yet she now seeks to retry the very issues that she elected to press before the arbitrator.

Under these circumstances, the arbitrator's decision is entitled to great weight.

### 2. *The Merits*

■ On the record before me, I conclude that no reasonable jury could find that Pender was capable of performing her job, with or without reasonable accommodation.

Pender's evidence that she was capable of performing her job is thin. It consists principally of her conclusory assertion that she was able to return to work and two documents from medical personnel stating, also in conclusory fashion, that she could return to work on February 16, 1999. The first document was the disability form from her doctor dated January 13, 1999 (DX 6, at J14); it does not address the issue of accommodations and does not give any indication whether the doctor understood what Pender's job entailed. Moreover, the form was not provided to DC 37 and Pender did not tell DC 37 that she had been purportedly cleared to return to her "usual work." The second document was the January 29, 1999 letter from a nurse at Mount Sinai; the letter stated that Pender was "medically fit" to return to work on February 16, 1999 and that she could perform *all* the major functions of her job, with "some accommodation." (DX 6, at J20). The letter did not identify the accommodations that would be needed and it also provided no indication that Mount Sinai was familiar with the details of the job.

In contrast, DC 37 has submitted substantial, detailed evidence that Pender was not capable of performing her job, including the following:

Pender sustained a serious medical illness and was out on medical leave for almost one year. When she returned, even though she was accommodated with a temporary modified, part-time assignment, she had a relapse on the job within three weeks, was hospitalized for five days, and went out on medical leave again. Dr. Reich, a consulting physician, had examined Pender before her relapse and had concluded even then that she was totally disabled and could not perform her previous duties. Pender's subsequent relapse shows that he was right. When DC 37 wrote to Pender on January 6, 1999 to report Dr. Reich's findings and to advise that Pender's job could not be held for her "indefinitely," she responded only by saying that she was "unable" to inform DC 37 of her plans—she did not state whether she was ready, willing, or able to return to work. (DX 6, at J17, J18).

On January 19, 1999, when DC 37 advised Pender that it could no longer hold the job for her, she had not been able to work full-time for almost *sixteen* months. (DX 6, at J19). The job had remained unfilled all that time, even though DC 37 had only ten Council Representatives and grievance representatives to service 10,000 workers in the hospitals division. Although she had been out on medical leave this second time for approximately ten weeks, she had not given DC 37 any indication of when she would be returning to work, if at all. It was only *after* DC 37 advised Pender that her employment was being terminated did Pender advise DC 37 (via the Mount Sinai nurse) that she could return to work with some accommodation. When DC 37 asked Pender what accommodations she wanted, Pender did not respond to the letter for six weeks and even

then she did not identify the accommodations she wanted. (DX 6, at J24). Likewise, although her private attorney wrote a letter protesting the termination, when DC 37 wrote back and expressed a willingness to meet, Pender did not respond, apparently because her lawyer never told her that DC 37 was willing to meet. (DX 6, at J21, J22).

The record also contains three admissions made by Pender (or her attorneys) that seriously undercut her current claim that she could return to work. She applied for Social Security benefits on February 12, 1999 and stated, under penalty of law, that she was still disabled. Her lawyers in her malpractice action stated, in responses to discovery requests, that she was "permanently disabled from returning to her employment." And in her interrogatory responses in this case, she stated that because of her disability she could not be exposed to hospital and medical facilities. Although an employee's application for Social Security disability benefits does not necessarily preclude a claim under the ADA, Pender's attempts to explain the statements are not convincing. Moreover, there are three such statements, not just one.

Finally, of course, the record contains the arbitrator's decision. For the reasons stated above, the decision is entitled to "great weight."

Pender argues that genuine issues of fact exist as to whether she could have performed her job with reasonable accommodations. There probably is some question as to whether certain adjustments could have been made; a reasonable jury probably could find that it would have been reasonable for DC 37 to accommodate Pender to the extent that arrangements could have been made so that she did not have to drive or attend picket lines and rallies in inclement weather or enter into certain areas of hospitals. But no reasonable jury could find, looking at the Council Representative position as a whole, that Pender could perform the essential functions of the job, even with these adjustments. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but she must produce sufficient evidence to support a rational jury verdict in her favor).

The Council Representative position was a difficult, strenuous job. It was not a nine-to-five office job. The Council Representative position existed because DC 37 members needed representatives in the field who were visible and accessible. Although a twelve-hour work day might not have been the "norm," many days did run long and often meetings were held in the evenings or at other odd times. Moreover, Pender worked in the hospitals division and consequently she was required to visit hospitals and other medical facilities. A reasonable jury could only find, as Kadlub concluded, that the job was too strenuous for Pender, as she "had been accommodated before and couldn't do the job even with accommodation." (Arb. Tr. at 614).

Finally, when the purposes of the ADA are considered, clearly DC 37 did not violate Pender's rights. The ADA does not guarantee continued employment to a person with disabilities. *See Christian v. St. Anthony Med. Ctr., Inc.,* 117 F.3d 1051, 1053 (7th Cir.1997) ("The [ADA] is not a general protection of medically afflicted persons."). Rather, the ADA provides that if a person with a disability *is* able to perform the essential functions of the job, with or without reasonable accommodation, an employer may not discriminate against her because of assumptions, stereotypes, or misconceptions about the ability of disabled individuals to work.

Here, the record shows unequivocally that DC 37 did not operate on the basis of

assumptions, stereotypes, or misconceptions about Pender. To the contrary, it provided Pender with more than a reasonable opportunity to show that she could perform the job. DC 37 held her job for her for sixteen months and paid her a full salary even though she could not work full-time at any time during those sixteen months. DC 37 tried to further accommodate her by letting her return to work on a temporary modified, part-time basis. But that effort failed because Pender simply was not able to handle it, even though the assignment was three days a week, six hours a day, and limited to office work. Even then it was only after ten more weeks of medical leave went by without any indication from Pender that she was ready, willing, or able to return did DC 37 terminate her employment. And when Pender finally indicated that she could return to work, with some accommodation, DC 37 asked her what accommodation she wanted, but she never responded in any meaningful fashion. Under these circumstances, no reasonable jury could conclude that DC 37 violated Pender's rights under the ADA or New York law.[5]

### CONCLUSION

For the foregoing reasons, DC 37's motion for summary judgment is granted. The Clerk of the Court shall enter judgment dismissing the complaint, with prejudice but without fees or costs.

SO ORDERED.

---

[5]. The parties do not distinguish substantively between the ADA claim and the state and city law claims and thus I do not discuss the state and city claims separately. (Pl. Mem. at 24; Def. Mem. at 29). In general, state and city employment discrimination claims follow federal law. There are some differences in the disabilities area, including in the definition of a disability, but the differences are not germane to this lawsuit. *Anyan v. New York Life Ins. Co.,* 192 F.Supp.2d 228, 245 (S.D.N.Y. 2002).